We're now ready to proceed in Monroe versus Columbia College Chicago. Thank you, Chief Jeff Sykes and Tom Rosenwine on behalf of Professor Monroe. May it please the court, Professor Monroe's lawsuit was filed in August 2017, consisted of four federal claims and two state law claims. The district court denied all the federal claims on the basis of timeliness and the state claims on summary judgment. I'd like to begin with discussing the decisions on timeliness on the federal claims. On a motion to dismiss, the district court ruled that Professor Monroe was 26 days late in filing his Title VII charges of discrimination with the EEOC and some five months late in filing his Section 1981 claim with the district court. Those determinations all turned on the question of whether Columbia College's provost or Columbia's president made the decision to deny tenure to Professor Monroe. If the provost determination is the controlling date, then Monroe's claims were brought too late. If the president's decision is the controlling date, then Professor Monroe's claims were timely and should not have been dismissed. And we believe that the court erred in dismissing the counts in large part by not applying the doctrine of equitable estoppel. Forgive me for interrupting because I think you can really help me. How does equitable estoppel help you as to the Title VII claims in counts one and two? It seems to me that your best argument is that the statements the college made to the EEOC would have led Mr. Monroe to believe that it was President Kim's decision that was the relevant decision for statute of limitations purposes. But by then, Mr. Monroe had already filed his EEOC charge, and it was either late or it was not. It seems that nothing the college said after that point mattered in terms of the timeliness of the EEOC charge, or did it? Well, we believe, Judge, that it did matter. Columbia College, in its submission to the EEOC, affirmatively stated that it was the president's decision that was the trigger date for the tenure denial. I mean, Columbia asserted that, quote, the provost issued a recommendation for denial of tenure, close quote, and also said that, quote, according to Columbia's tenure process, the president makes a final decision regarding the granting or denial of tenure. President Kim determined that tenure should not be granted. So it couldn't be clearer that Columbia affirmatively represented that it was the president who made the final decision. If it's the president who made the final decision, that decision was rendered in August of 2013, and the EEOC was filed in February. That was within 175 days of the president's decision. So that would be a timely submission to the EEOC. So that's why we believe that that affirmative statement was part of the factors involved with equitable estoppel. Columbia raised no statute of limitations defense in its response to the charge in the EEOC. As you know, that case pended in the EEOC for three and a half years. Columbia did not amend its response to add a defense of statute of limitations during that period of time. And as you know, historically earlier, it was during Professor Monroe's third-year review, it was the president who specifically stated that the decision to retain Professor Monroe on the faculty was, quote, my decision, unquote. He repeated that twice in his written statement to Professor Monroe. I think the other factor here to consider is that the rationale for applying a statute of limitations is to ensure that litigants don't sleep on their rights and allow respondents to be timely informed regarding the claims that are made against them. And here, Professor Monroe did not sleep on his rights. He filed a charge with the Chicago Commission on Human Relations one month after the president made his decision. And that gets notified to Columbia. So they're alerted that there is a claim out there. And while that may have been the wrong forum, as the district court cited the O'Shiver case, the Third Circuit case, tolling the statute of limitations is appropriate where the plaintiff has asserted his or her rights mistakenly in the wrong forum. And I should add here also, I think as part of the equitable estoppel analysis that the EEOC, as you know, has a duty to police and enforce its own filing requirements. And it does so. Here, it did not reject the claims on the basis that they were too late. It accepted them and investigated them for over three years. And so that's, I think, an additional factor here that informs the equitable estoppel analysis. Columbia has disputed whether there is any detrimental reliance. But I think here's what's important. If Columbia had asserted that the filing was too late, if it had asserted that it was the provost's decision that's operative rather than the president's, then Professor Monroe would have been alerted to that issue. The EEOC might well have denied the claim. And Professor Monroe could have then timely filed his Section 1981 claim, his Title VI claim. He would have had approximately three years from when Columbia filed its response in the EEOC to file a Section 1981 claim and at least 11 months with respect to Title VI to file a claim under Title VI, assuming that your statute applies to Title VI. I'm sorry. I'm sorry. But of course, to succeed on an equitable estoppel claim, you have to show that the college engaged in a deliberate effort to deceive Mr. Monroe. So, what is the evidence of deliberate deception? Okay. Well, I think that the formula for determining equitable estoppel does not rely strictly on deliberate. There also can be a lulling and any kind of affirmative action that misleads a party to believe something is a basis for equitable estoppel. What comes closest to deliberate is obviously the statement that is made in the EEOC in their response to the EEOC, where they make the affirmative statement that it was the President who made the decision. That's the person. That's the final act of discrimination. It's the President's decision to deny tenure. So, that comes closest to the deliberate. But I would question whether or not deliberate action is the requirement under the law. I believe it's a little broader than that, where there are active steps that are taken by Columbia in this case, which they were, which they did take. That would qualify as equitable estoppel, along with, as I say, these other factors. So, I hope that responds to your question, Judge Rovner. Rovner, are you familiar with our case of Lever versus Northwestern University, which seems to be very similar to what we have here? At least to me, it seems similar. Okay. I do not recall the facts that were involved in that case, Your Honor. So, I apologize. Well, that was another case where the decision was with the provost, and then the question of whether there was action to be further taken with it. I'll ask Ms. Kay if she's familiar. Neither of you are, then there's no need for me to proceed. Okay. Yeah. No, I'm sorry, Judge. I'm not sure that that case was cited below. It's not cited in either brief. Yeah. And it seems to me to be perhaps most analogous, but we'll leave it at that. Thank you. Okay. Okay. Since I mentioned Title VI, I think I do want to make a brief statement about that. There is an issue here about whether there's a two-year or five-year statute of limitations on a Title VI claim. There is the Beard v. Robinson case that this court decided, and we believe it remains good law. It's never been overturned by the Supreme Court or by this court. Obviously, the district court believed that there are enough decisions and signs that certain aspects of the Beard decision may no longer be operative. But with respect to Title VI, I think that the Beard decision still is important and needs to be followed. Title VI is a little different from other civil rights statutes in that it involves basically three parties, not just the employer and the employee or student, educational employer or the faculty member or the student, but also the government itself as a fund provider. There is clearly the personal injury to the employee, but there's also an injury to the government, if you will. It's not a personal injury, but it's a violation of the non-discrimination requirement of financial grants that are given. That's a kind of a form of a contract breach that doesn't easily translate to a personal injury. And as you know, as we cited in the reply brief, Title VI in its sections does refer to the general statute involving the government bringing actions, which is a five-year statute. And so we think that that with respect to Title VI, that it would be important for this court to take a look at Beard in relation to Title VI and to affirm that with regard to Title VI in any event, five-year statute of limitations makes eminent sense. I did want to talk about some other issues, including the state law claims, but I see that I have approximately three minutes left, and I would like to reserve some time for rebuttal. So I will stop at this point. MS. MCDOWELL. That's fine. Thank you. Ms. Kaye. MS. KAYE. Yes, thank you. I'm just responding to the question that Judge Oldenburg posed. He is correct that by the time Columbia allegedly engaged in this deliberate effort to lull Mr. Monroe into delaying his charge, the charge had already been filed. There was no undoing that event. So any action— MS. MCDOWELL. MS. KAYE. —was actually the relevant decision, might he not have filed federal suit sooner, you know, rendering his Section 1981 and his Title VI claims timely. You know, the College's statements to the EEOC may have lulled Mr. Monroe into thinking that President Kim's decision was the relevant one for statute of limitation purposes. MS. MCDOWELL. Your Honor, my response to that would be that there still must be, as you noted, either a deliberate intent to delay or engaging in actions that the College would unmistakably have understood to cause a delay. That is actually the standard that's applied. And I believe Mr. Monroe has failed to provide any evidence of either, either a deliberate intent or certainly that Columbia would have unmistakably understood what Mr. Monroe and his attorney or without his attorney would have had in mind for later actions that they could have brought to seek relief. He's made the argument, but it's not supported by any factual evidence. And the fact that he—touching on the—continuing on the equitable tolling argument, the O'Shiver case actually was not relied upon by the district court. It was cited at page 12 of the plaintiff's reply brief on the motion to dismiss. The district court referenced O'Shiver, which is a Third Circuit case, by the way, and is therefore not controlling, although it does provide some information. But the district court did not rely on it. Mr. Monroe did not provide any citation to any case law from this circuit that allows the extension of a deadline for filing based on the filing in the wrong venue. And in fact, that's not even what happened here because Mr. Monroe filed a claim for violation of the City of Chicago Human Rights Ordinance at the City of Chicago Commission on Human Relations. He didn't file a Title VII claim at the city. He filed a city claim at the city. Then he filed his Title VII action in the correct forum. He just filed it 26 days too late. So with regard to the equitable tolling argument, we don't believe he has any footing there. His citation to the Burnett, the Supreme Court case, also was unhelpful because in that case the plaintiff actually did file his F.E.L.A. claim in the proper forum in the state of Illinois. There was a venue issue there. So that is a response to the question regarding tolling. With regard to Mr. Rosenwhite's statement that President Carter, who was the former president, years before the tenure application was made, Mr. President Carter did reverse the decision to terminate Mr. Monroe from the tenure track to completely terminate his employment. But that is a different process. As the district court correctly noted, Dr. Carter had that ability pursuant to the Columbia's policies to make the final decision on employment. He did not have the final decision on a tenure application and neither did President Kim, which was clear in President Kim's letter on appeal when Mr. Monroe was denied tenure by Provost Love. President Kim examined the appeal of that decision and declined to overturn the provost's decision. So I'm hoping that addresses the questions. With regard to the Title VI question, we assert that the district court correctly decided that a two-year statute of limitations should apply since the Beard decision relied on the five-year statute of limitations, basing its reasoning on the notion that federal civil rights claims and personal injury torts were not sufficiently similar to apply the same. The Wilson v. Garcia case by the U.S. Supreme Court changed the trajectory on that and did determine that there is sufficient similarity between personal injury cases under common law tort and federal civil rights actions, such as 1983 and 1981, to apply the state statute of limitations. And so the district court correctly applied the Illinois statute of limitations, which is two years. Going back to the question, again, wanting to raise the state claim, touch upon that briefly. It is our position that the district court did properly decide both of those counts. For intentional interference contract, the district court correctly noted that to succeed on a claim like that, a plaintiff must have demonstrated the existence of a contract and the existence of a breach of that contract. In this matter, allegedly, the contract in question was the Columbia's procedure for considering an application for tenure and granting or denying tenure. A very detailed list of steps, as the district court noted, is involved in that process. It's a multi-level process. There is no evidence that Columbia failed to follow any of those steps. Mr. Monroe was unhappy, obviously, with the result, but there was no breach. And Columbia doesn't even concede that the statement of policy was actually a contract. But if that is the position that Mr. Monroe has decided to take, he nevertheless cannot demonstrate that there was a breach of any of the so-called contract. With regard to tortious interference with business expectancy, the district court again correctly found that the expectation of tenure, even in the abstract, tenure is never a sure thing. It is so highly discretionary within the context of academia that any expectation would be, for any academic, unreasonable. For Mr. Monroe in particular, in this case, having been terminated at the three-year mark for failing to comply with some of the most fundamental requirements of teaching, such as showing up to class on time, returning graded work, advising, holding, keeping appointments that are scheduled with students, having been terminated for that, and then having those same issues observed and brought up to those who were reviewing his application for tenure, he surely could not have had a reasonable expectation that tenure would be granted. Now, why wouldn't or couldn't the sorts of opportunities that Mr. Monroe has alleged he was denied in his terminal year add up to an adverse employment action in the sense that they diminished his future career prospects? Your Honor, the amendment to Mr. Monroe's complaint, you're correct, did incorporate some additional actions that allegedly were taken against him. None of those, however, constituted tangible consequences, such as a loss of compensation, a change of rank, and any, in response to your question, any impact they might have had on future employment is all speculative. There was no evidence, for example, because recall, please, that this is all post-tenure denial. A tenure denial probably does hurt prospects for future employment, but that was not included in the collection of items that were part of the amended complaint, and none of those items, either together or individually, the district court found correctly, had showed evidence of an impact on Mr. Monroe's ability to get work at his, with a future employer. Things like a change in his schedule. He actually was allowed, by the way, at that point to teach advanced courses at the end of his term there, so the district court's observation that there was zero evidence of harm to his future prospects was correct. It was merely an argument based on speculation at that point, and I'm sorry. The argument was rejected on 12B6 grounds, as I believe. So to talk about insufficient evidence really misses the point of whether the allegations were sufficient to move forward. That's correct, Your Honor. I apologize. Going back and forth from the summary judgment to the motion to dismiss, I'm misspeaking. You are correct. I would still say that based on what appeared on the page in that amended complaint, those allegations were insufficient to demonstrate that there was a true and well-founded risk to Mr. Monroe's future employment. I see that I have three minutes left, and I don't, if it's possible to reserve that for rebuttal, I would like to. Otherwise, I can continue. Right, because you don't get rebuttal. I apologize, Your Honor. I'm missing these. So I'll continue. Are you used to being the plaintiff's attorney? I am not. Apologies, I'm new. Oh, I will then use the remainder of my time to review, unless there are questions, of course, going back to the merits of Mr. Monroe's discrimination claim. He did not address those in his brief. However, his statement of facts did incorporate a number of facts that seemed to argue the substance of his claim. And so, Columbia would like to address those in this forum. As I noted before, Mr. Monroe was cited on several occasions for failing to comply with some of the most fundamental requirements of teaching. Shortly after his first year of employment, Provost Love cited those concerns that she had, and she identified them as minimal expectations for teaching. They would be expectations for any teacher, especially one who was hoping to obtain tenure at Columbia College Chicago. It certainly seems as if from the start, his students were not sanguine, shall we say, about having an African American professor. How would all of that have factored into his actions? Your Honor, I would respond by saying that the concerns about timeliness, showing up to class, keeping appointments with student advisees, turning back grades was not a criticism that was directed at Mr. Monroe because of his race. It was a problem with classroom management. Mr. Monroe was unable to provide or to identify any non-African American professors who suffered from the same deficiencies and yet received more favorable treatment either from students or from the administration. In fact, he identified an individual, Crystal Griffith, who also was African American, who worked in the same department as Mr. Monroe under the same chair, Bruce Sheridan, and did receive an award of tenure. And a second African American, Carla Rae Fuller, in the same department, under the same chair, also received tenure. I see that my time has expired. All right, thank you very much. Mr. Rosen. Yes, thank you. Thank you, Your Honor. Well, there's several points here and I will try to see if I can cover them briefly. There was, with regard to the state law claims, there was a breach of contract. Ms. Kaye has referred to the fact that the procedures were followed, but our claim of the breach of contract was a substantive breach of the criteria, the application of the criteria for tenure. And that's the three, the traditional three requirements that I'm sure you're familiar with, the teaching service, and in this case, not scholarship, but creative activity. And there, Mr. Sheridan, by virtue of his report on the tenure, which contained all kinds of false allegations, including the allegations that Ms. Kaye referred to about not being responsive to students and so on, which was absolutely not true, as well as his restricting of all the opportunities that Mr. Monroe had. These were presented in such a way that those above him, above Sheridan, the provost, who was an interim position, the new president, would take to mean that he had not met the criteria in comparison to other people. But in this case, it's clear that there's a question of fact as to whether or not that contract to receive tenure was violated, because you did have the department voted in favor of his tenure, very strongly in favor of his tenure, and the dean voted for him to receive tenure. So it's the, our argument is it's the effect of Sheridan, who is then looked to by the professor Monroe was doing, because he's a supervisor, that that had the influence to derail the tenure situation. So there was a contract and it was breached. So there is that issue. With regard to Crystal Griffith, that was just mentioned, she actually resigned this tenure grant that was given to her precisely because, and the affidavit is part of the record, her affidavit is part of the record, precisely because she felt it was a discriminatory, hostile environment to be in, and she didn't want to be there. She received her tenure despite Sheridan's attempts to derail that. And I do think that also, Chief Judge Sykes, you're correct that we're dealing with the question of on the, well, I'll just finish my thought if I may, that we are dealing with a motion to dismiss one with respect to the actions that occurred during Mr. Monroe's last year. And so it's the question is whether it's plausible that the list of things that occurred during that last year were abusive. Is it plausible that that was abusive? That's the standard. And that we believe the judge erred in not using that standard in assessing those claims. Thank you. Our thanks to both counsel. The case is taken under assignment.